# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SEOKOH, INC., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **C.A. No. 2020-0613-JRS** |
| | ) | |
| LARD-PT, LLC, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PROCESS TECHNOLOGIES AND | ) | |
| PACKAGING, LLC, a Delaware | ) | |
| Limited Liability Company, | ) | |
| | ) | |
| Nominal Respondent. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 15, 2021
Date Decided: March 30, 2021

Jacob R. Kirkham, Esquire of Kobre & Kim LLP, Wilmington, Delaware and Robin J. Baik, Esquire, Leif T. Simonson, Esquire, S. Nathan Park, Esquire of Kobre & Kim LLP, New York, New York, Attorneys for Petitioner Seokoh, Inc.

John G. Harris, Esquire and Peter C. McGivney, Esquire of Berger Harris LLP, Wilmington, Delaware and Stuart Kagen, Esquire and Russell Bogart, Esquire of Kagen, Caspersen & Bogart PLLC, New York, New York, Attorneys for Respondent Lard-PT, LLC.

**SLIGHTS, Vice Chancellor**

When conjuring an image of compromise, many invoke King Solomon, or Jedidiah, the proverbial source of the classic aphorism, "split the baby."[1] But according to the Book of Genesis, Abraham and Lot were equally adept at compromise.[2] When a dispute over the division of territory arose between these two wealthy men, they devised a process for fair division that eventually was employed by others in the region to divide all manner of tangible things, from real property to food.[3] The process, called "divide-and-choose" or "I cut, you choose," was elegantly simple: one person (the cutter) would divide the disputed matter into two pieces and then allow the other (the chooser) to choose which piece she would take for herself.[4] The incentives for fair partition are obvious: the cutter is incented to divide in equal pieces knowing she will be left with the piece the chooser leaves behind.

Parties planning to enter a joint business venture are wise to consider the story of Abraham and Lot. On a clear day, when relationships are strong and visions for the joint venture are aligned, chary business planners will consider the best strategy to address the prospect that the joint venturers might one day confront intractable

---

[1] *Kings* 3:16–28.

[2] *Genesis* 13:5–18.

[3] *Id.* United Nations Convention on the Law of the Sea annex III, art. 8, Dec. 10, 1982, 1833 U.N.T.S. 397.

[4] Steven J. Brams, Alan D. Taylor, *Fair Division: From Cake-Cutting to Dispute Resolution*, (Cambridge Univ. Press 1996).

gridlock in the management of their business. One effective strategy is to agree in advance to divide-and-choose.

The parties to this dissolution proceeding, Petitioner Seokoh, Inc. ("Seokoh") and Respondent Lard-PT, LLC ("Lard")—joint venturers in Process Technologies and Packaging, LLC ("PTP" or the "Company")—attempted to do just that. They employed a version of divide-and-choose to resolve deadlock among the members of PTP's board of directors (the "Board") for certain issues requiring unanimous Member approval ("Reserved Matters"). At Section 10.2 (titled "Member Deadlock") of PTP's Third Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"),[5] the parties agreed that, in the event a Member (as defined) materially breaches the Operating Agreement's terms or the Members cannot resolve a Reserved Matter (both defined as a "Deadlock"), the chief executive officers of the two Members' parent companies—Kolmar Korea Co., Ltd. ("Kolmar") and WLM Holdings ("WLM")—will meet within twenty days to attempt to resolve the matters giving rise to the Deadlock in good faith.[6] If the

---

[5] Verified First Am. Pet. for Judicial Dissolution Pursuant to 6 *Del. C.* § 18-802 ("Pet.") Ex. A ("OA") (D.I. 10).

[6] *Id.* § 10.2(a).

Deadlock is not resolved, either party may give notice (the "Deadlock Notice") to the other that it intends to implement the Deadlock procedure.[7]

To commence the Deadlock procedure, the initiating Member must state in the Deadlock Notice the price at which the receiving Member can choose either to buy the initiating Member's interest in PTP or sell its own.[8] The receiving Member then has thirty days from receipt of the Deadlock Notice to choose whether it will be a buyer or seller at the designated price, failing which the receiving Member is deemed to have accepted the initiating Member's offer to sell.[9] As incentive for Members to abide by the negotiated Deadlock procedure, the Member Deadlock provision states that if a Member breaches the obligation to buy or sell, or otherwise materially breaches the Operating Agreement, the non-defaulting Member has "the option" either to buy or sell its interests to the defaulting Member at a 30% price adjustment in its favor (i.e., at a discount or premium, respectively).[10]

---

[7] *Id.* § 10.2(b).

[8] *Id.* § 10.2(c).

[9] *Id.* § 10.2(d). A version of this approach is referred to by some as a "Texas Shoot Out." *See In re Shawe & Elting LLC*, 2015 WL 4874733, at *32 n.326 (Del. Ch. Aug. 13, 2015), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017) ("A 'Texas shoot out' format is an auction process in which either [owner] would specify a price for his/her interest in the Company and the other would have the option either to buy the other's interest at the specified price or to sell his/her own interest at that price.").

[10] OA § 10.2(e).

Seokoh and Lard are in Deadlock. Unfortunately, in this instance, PTP's Deadlock procedure has not delivered the parties to the intended destination and they remain in Deadlock, a state that has existed for two years and has caused PTP to hemorrhage cash and lose key personnel. To stop the bleeding, Seokoh filed suit in New York, claiming Lard was in breach of the Deadlock procedure and seeking a decree of specific performance that would require Lard to honor Section 10.2 by selling its PTP stake to Seokoh at a 30% discount. Lard denied Seokoh's allegations of breach and counterclaimed that Seokoh has breached the Operating Agreement and must now buy out Lard's interest at a 30% premium. Lard's showcase argument was that Section 10.2(e) contemplated an irrevocable option that either Lard or Seokoh exercised upon seeking specific performance in New York. According to Lard, all that is left for decision is the price at which Seokoh must consummate the buyout.

On July 23, 2020, Seokoh filed its Verified Petition for Judicial Dissolution with this Court, in which it seeks a decree that PTP should be dissolved under 6 *Del. C.* § 18-802 ("Section 18-802") because it is no longer "reasonably practicable" for PTP to carry on its business in conformity with the Operating Agreement.[11] In response, Lard sought a temporary restraining order ("TRO") from

---

[11] *See* D.I. 1; Pet. ¶¶ 82–86.

4

the New York court to restrain Seokoh from prosecuting this dissolution action while the New York court adjudicated Lard's claim for specific performance of Section 10.2(e). That motion was granted but later vacated after the New York court determined on summary judgment that Lard's option contract theory was flawed and could not support its demand for specific performance. The parties have since agreed to stay the New York proceedings in favor of this one.[12]

Lard has moved to dismiss Seokoh's petition for dissolution on two grounds. First, Lard argues that Seokoh has not well pled that PTP is in fact deadlocked. Second, Lard recycles the same option theory thrown out in New York, arguing that the Deadlock procedure provides a viable means by which Lard can exit the Company after Seokoh buys out Lard's stake. For reasons explained below, I disagree on both points and deny Lard's motion in full.

## I.  BACKGROUND

The background facts are drawn from the Petition and the documents it incorporates by reference.[13]  For purposes of this motion only, I accept as true the

---

[12] D.I. 52.

[13] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

Petition's well-pled factual allegations and draw all reasonable inferences in the Petitioner's favor.[14]

**A. Parties**

Petitioner, Seokoh, is a Delaware corporation with its principal place of business in Pennsylvania.[15] Seokoh is a wholly-owned subsidiary of Kolmar Korea Co., Ltd. ("Kolmar").[16] Kolmar designs and manufactures cosmetic products for other companies.[17]

Respondent, Lard, is a Delaware LLC owned and operated by Alan and David Wormser (together, the "Wormsers"), who also own and operate non-party, Wormser Corporation ("Wormser Corp.").[18] Lard is the successor-in-interest of WLM Holdings, LLC ("WLM Holdings"), the original signatory to PTP's Operating Agreement.[19]

---

[14] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[15] Pet. ¶ 4.

[16] *Id.*

[17] Pet. ¶ 10.

[18] Pet. ¶ 5.

[19] *Id.*

Nominal Respondent, PTP, is a Delaware LLC formed in 2010.[20] In 2016, Seokoh and Lard became 51% and 49% Members in PTP, respectively, intending to operate the Company as a joint venture engaged in the development and manufacturing of cosmetics.[21]

## B. The PTP Joint Venture

As noted, Kolmar was founded in 1990 as a South Korean manufacturer of cosmetics, among other products.[22] It found success as an original design manufacturer, producing cosmetic products for other consumer-facing firms to re-brand for sale.[23]

To expand its operations into the United States, Kolmar entered into a joint venture with the Wormsers, acquiring through its wholly-owned subsidiary, Seokoh, a 51% stake in PTP, a company that develops and manufactures cosmetic products in the United States.[24] The transaction was consummated on September 19, 2016.[25] Three weeks later, on October 13, 2016, the parties executed the Operating

---

[20] Pet. ¶ 6.

[21] *Id.*

[22] Pet. ¶ 10.

[23] *Id.*

[24] Pet. ¶ 12.

[25] *Id.*

Agreement, with Kolmar and the Wormsers listing their holding companies, Seokoh and WLM Holdings, respectively, as Members.[26] Eventually, Lard assumed the interest of WLM Holdings, becoming a Member of PTP and the Wormsers' designated counterpart to Kolmar's Seokoh.[27]

### C. The Operating Agreement

The Operating Agreement memorializes the terms by which Seokoh and Lard would conduct their joint venture. The Company is to be managed, operated and controlled by the Board.[28] The Board, in turn, is comprised of six Directors: three designated by Kolmar (the "Kolmar Directors") and three designated by WLM (the "WLM Directors").[29] The Chairman of the Board is chosen by Kolmar, while day-to-day operations are conducted under the supervision and direction of the WLM-designated Directors.[30] Section 7.10(a) provides that the Company's officers

---

[26] *Id.*; *see also* OA at 1.

[27] Pet. ¶¶ 5, 12.

[28] *See* Pet. ¶¶ 13–17 (citing OA §§ 2.3, 7.2, 7.8).

[29] OA § 7.2(a). During the time leading up to this dispute, the Board comprised five directors: three appointed by Kolmar, and two appointed by the Wormsers—David and Alan Wormser. Pet. ¶ 14. Under Section 7.8(e), however, voting at the Board level remained equal, as each of the two Wormser directors were given "one and a half votes in connection with any action taken by the Board or any Committee." *See* OA § 7.8(e).

[30] OA §§ 7.2(b)–(c).

are to be "approved by the Board."[31]  Management and control are thus divided equally between Kolmar and WLM.

Under Section 8.6 of the Operating Agreement, PTP can only take certain actions, defined in the Operating Agreement as "Reserved Matters," with the consent of both Seokoh and Lard.[32]  Reserved Matters include capital expenditures or new indebtedness in excess of $100,000 and the dissolution of PTP, among others.[33]

As both parties well understood, the equal division of directors on the Board created the threat of deadlock should the two factions disagree on the Company's direction.  In Section 10.2, the parties contemplated a procedure to break Board "Deadlock," a term defined in Section 10.2(a) as "(i) a Reserved Matter . . . not agreed upon (that, if not resolved would result in a material adverse effect to the Company) at three consecutive meetings of the Members of the Company," or (ii) when "either Member materially breaches the terms of this Agreement."[34] If Deadlock occurs, the Chief Executive Officers of Kolmar and WLM are required to meet and attempt to resolve the matter in good faith.[35]  But if they fail to reach a

---

[31] *Id.* § 7.10(a).

[32] *Id.* § 8.6.

[33] *Id.* §§ 8.6(d), 8.6(k), 8.6(n).

[34] *Id.* § 10.2(a).

[35] *Id.*

9

resolution within the contractually allotted time, either Member can serve the other with a Deadlock Notice.[36]  Service of a Deadlock Notice triggers the Deadlock procedure set forth in Sections 10.2(c), (d) and (e).[37]

The Deadlock procedure was intended to break the Deadlock by facilitating the buyout of one or the other Member's stake in PTP.[38]  In this regard, Section 10.2(c) stated: "The Initiating Member may serve a notice on the Other Member which requires the Other Member to either, at the price specified in the notice, (i) purchase the Initiating Member's entire Interests or (ii) sell the Other Member's entire Interests to the Initiating Member."[39]  Under Section 10.2(d), the receiving Member must notify the Initiating Member whether it agrees to purchase the offered interest or to sell on those terms in same day funds paid at closing within thirty days of receiving a Deadlock Notice.[40]

Section 10.2(e) then states:

> If a Member breaches any of the provisions of Section 10.2(d) above, the non-defaulting Member shall have the option to (i) buy (if such Member was required to sell its Interests pursuant to Section 10.2(c)) the defaulting Member's Interests at a proportionate price determined

---

[36] *Id.* § 10.2(b).

[37] *Id.* §§ 10.2(c)–(e).

[38] *See id.* § 10.2(c).

[39] *Id.*

[40] *Id.* § 10.2(d).

10

in accordance with Section 10.2(c), discounted by 30% or (ii) sell (if such Member was required to buy the defaulting Member's Interests) its Interests to the defaulting Member at a proportionate price determined in accordance with Section 10.2(c), increased by 30%.[41]

In Section 14.5(a), the parties selected Delaware law to govern "all questions concerning the construction, validity and interpretation of this Agreement . . . ."[42] And Section 14.5(b) states that any "suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement . . . whether in contract, tort or otherwise, shall be brought exclusively in the state or federal courts located in New York, New York."[43]

## D. The Parties Become Deadlocked

By mid-2017, the two Members came to disagree on PTP's strategic direction: Kolmar and Seokoh favored aggressive expansion while WLM and Lard favored a more gradual growth strategy.[44] Disputes also arose over PTP's facilities.[45] Seokoh

---

[41] *Id.* § 10.2(e).

[42] *Id.* § 14.5(a).

[43] *Id.* § 14.5(b). The parties agree that, notwithstanding the New York forum selection clause, only a Delaware court can adjudicate a petition to dissolve PTP, a Delaware LLC. Seokoh's Answering Br. in Opp'n to Resp't's Mot. to Dismiss ("Pet'r's Answering Br.") at 29 n.136 (D.I. 40); Lard's Reply Br. in Further Supp. of its Mot. to Dismiss ("Resp't's Reply Br.") at 1 (D.I. 44); *see also* 6 *Del. C.* § 18-802. As discussed below, that agreement is well-founded.

[44] *See* Pet. ¶ 22.

[45] Pet. ¶ 24.

11

wanted to purchase the real estate on which PTP's facilities are currently located, in addition to an adjacent lot; Lard favored relocating PTP to a cheaper, unidentified location.[46]

In November 2017, Seokoh moved unilaterally to purchase PTP's current location and the adjacent property under its own name, keeping in place the terms of PTP's lease.[47] Seokoh then proposed a joint capital call so that PTP could purchase from Seokoh the property PTP was currently renting.[48] Lard rejected the proposal, notwithstanding the fact that it had no viable alternative location for PTP.[49]

The discord between PTP's two Members began to take a toll on PTP's business, despite good market conditions for cosmetics.[50] By the end of 2018, PTP faced a severe cash shortage, prompting Seokoh and Lard each to loan PTP $750,000.[51] In January 2019, PTP's CEO resigned.[52] David Wormser wrote a letter on behalf of Lard addressed to Kolmar purporting to designate Michael Lorelli as

---

[46] Pet. ¶¶ 25–26.

[47] Pet. ¶¶ 26–27.

[48] Pet. ¶ 28.

[49] *Id.*

[50] Pet. ¶ 29.

[51] *Id.*

[52] Pet. ¶¶ 30, 33.

the interim CEO, with Alan Wormser to oversee PTP's operations until Lorelli could be installed.[53]

Around the same time, apparently sensing trouble brewing, PTP's financial comptroller, Shawnna Giumento, sought guidance from the Company's outside counsel regarding the proper procedure for appointing a new CEO.[54] That guidance came on January 19, 2019, when counsel advised the Company that Section 7.10 of the Operating Agreement required that "the CEO appointed by WLM Directors [] be approved by Kolmar," and therefore, "absent a meeting of the Board of Directors, I presume a unanimous consent in lieu of a meeting will be circulated for signature identifying the WLM designated new CEO which [] will [then be] approved by all of the Directors."[55] Acting on this advice, Giumento emailed the Wormsers and Kolmar to obtain written consents for (1) the acceptance of former CEO Levine's resignation; and (2) the appointment of Alan Wormser (not Lorelli) as the successor CEO.

On January 22, 2019, Kolmar responded by consenting to the acceptance of Levine's resignation, but rejecting the appointment of Alan Wormser as CEO given

---

[53] Pet. ¶ 34.

[54] Pet. ¶ 35.

[55] *Id.*

his conflict of interest, as Wormser Corp. is a PTP competitor.[56]  Two days later, David Wormser emailed the Kolmar Directors claiming that "PTP's governing document is very clear that the Kolmar directors have no consent rights over CEO appointment."[57]  Five days later, on January 29, the Wormsers had Lorelli appear at PTP's offices as the interim CEO.[58]  The Members' competing positions on the validity of Lorelli's appointment as PTP's interim CEO caused significant internal confusion among PTP's staff and outside counsel.[59]  In the midst of this confusion, Lorelli abruptly left PTP soon after he had arrived, and the Company has been without a legitimately appointed CEO since January 2019.[60]

### E. The Failed Deadlock Procedure

The Members' disagreement on the CEO appointment process led each to accuse the other of breaching the Operating Agreement, declare a Deadlock under Section 10.2 and initiate the Deadlock resolution procedure.[61]  As required in Section 10.2(a) of the Operating Agreement, both Lard and Seokoh requested to

---

[56] Pet. ¶ 37.

[57] Pet. ¶ 38.

[58] Pet. ¶ 39.

[59] Pet. ¶ 40.

[60] Pet. ¶ 43.

[61] Pet. ¶¶ 44–45.

meet with the other side's CEO to resolve the Deadlock in good faith.[62] That meeting occurred on February 27, 2019.[63] Ultimately, the parties could not resolve their disagreements on topics running the gamut, including business philosophy, facility expansion, the appointment process for the interim CEO and issues relating to PTP's location and lease on its current facilities.[64]

On March 19, 2019, Seokoh issued a Deadlock Notice to Lard under Section 10.2(b) of the Operating Agreement (the "March Deadlock Notice"), in which it declared that Lard had the option of either (i) buying out Seokoh's 51% interest for $10,408,163.27, or (ii) selling Lard's 49% interest for $10,000,000.[65] In its reply on April 15, 2019, Lard elected to buy out Seokoh's interest, but conditioned its purchase upon Seokoh's acceptance of several additional terms.[66]

Seokoh agreed to several of Lard's additional conditions but refused to accept Lard's demands that Seokoh extend PTP's lease and that the Kolmar Directors vote

---

[62] *See* Pet. ¶ 46; OA § 10.2(a).

[63] Pet. ¶ 46.

[64] *Id.*

[65] Pet. ¶ 47; *see* OA § 10.2(b).

[66] Pet. ¶¶ 49–50. For example, Lard demanded that Seokoh extend the lease for PTP's facilities for up to 12 months, and that the Kolmar Directors either resign effective immediately or vote in accordance with Lard's direction prior to closing. *Id.*

under Lard's direction while the buyout transaction was pending.[67] The disputes did not end there. In preparing to exit PTP, Seokoh sought to restructure PTP's lines of credit totaling $20.5 million for which Kolmar was the sole guarantor.[68] With one of the lines of credit scheduled to mature soon, Seokoh demanded that Lard replace Kolmar as the guarantor. Lard refused.[69] Lard countered that Kolmar should continue to guarantee 51% of PTP's outstanding lines of credit even though it was to sell its 51% stake in PTP to Lard. Kolmar refused.[70]

By mid-May 2019, the Members had exchanged a basic term sheet for Lard to purchase Seokoh's interest in PTP.[71] But the negotiations broke down once again by July 30, as the Members could not agree on basic buyout terms, including when the deal would be closed and whether PTP's lease needed to be extended.[72] Seokoh requested that the deal close by the end of August 2019, and for PTP to leave the

---

[67] Pet. ¶ 50. In a letter dated April 24, 2019, Seokoh informed Lard that Lard's addition of extra-contractual conditions to its buyout election rendered the entirety of the election ineffective under the Operating Agreement. *Id.*

[68] Pet. ¶ 51.

[69] Pet. ¶ 52.

[70] *Id.*

[71] Pet. ¶ 54.

[72] *Id.*

premises (now owned by Kolmar) before November 30, 2019.[73]  Lard, however, demanded that the lease be extended for six months after closing.[74]

On June 28, 2019, Kolmar's CEO wrote to Lard stating Lard was in breach of the Operating Agreement and declaring, "we hereby exercise our option to buy out Lard-PT's 49% ownership in the Company at US $10,000,000 in accordance with Section 10.2(e) of the LLC Agreement" (the "June Letter").[75]  While Kolmar pointed out that Section 10.2(e) gave it the "right to buy Lard-PT's Interest at a 30% discount," it offered "to pay the full price . . . out of good faith and in the interest of swift transition of ownership."[76]  Kolmar made clear, however, that its offer to pay full price was "on the express condition that the deal be closed by July 31, 2019."[77]  That deadline came and went with no deal.[78]

---

[73] *Id.*

[74] *Id.*

[75] Pet. Ex. B ("New York Op.") at 15 (D.I. 10).

[76] *Id.* at 15–16.

[77] *Id.* at 16; *see also* Pet. ¶ 54.

[78] Pet. ¶ 54.

17

## F. Litigation Ensues

On August 21, 2019, Seokoh initiated eviction proceedings against PTP under the lease between Seokoh and PTP (the "Eviction Litigation").[79] The Eviction Litigation is active and ongoing.[80]

After the Wormsers made no effort to secure new financing, PTP defaulted on its $20.5 million lines of credit, forcing Kolmar as the sole guarantor to forfeit its collateral.[81] On September 24, 2019, and again on October 25, 2019, Kolmar initiated legal proceedings as guarantor against PTP for indemnity (the "Indemnity Litigation").[82] The case was voluntarily dismissed without prejudice on May 26, 2020, but refiled on June 10, 2020.[83]

In January 2020, Kolmar and Seokoh invited the Wormsers to make an offer to resolve the situation at PTP amicably.[84] After receiving the Wormsers' offer on January 23, 2020, Kolmar and Seokoh came to believe Lard was incapable of mustering the financial resources necessary to consummate a buyout of Seokoh's

---

[79] Pet. ¶ 57.

[80] *Id.*

[81] Pet. ¶ 58.

[82] *Id.*

[83] *Id.*

[84] Pet. ¶ 61.

51% interest.[85]  Accordingly, on January 31, 2020, Seokoh expressed its willingness to explore a purchase of Lard's 49% interest at $10,000,000, in line with the previous offer made to Lard under the Deadlock procedure.[86]  Seokoh viewed this offer as generous, given that Section 10.2(e) entitled the non-breaching Member to purchase the breaching Member's interest at a 30% discount.[87]  Lard declined the offer.[88]

In response, on February 12, 2020, Seokoh brought an action in the New York Supreme Court seeking specific performance of the Deadlock provision under Section 14.3 of the Operating Agreement, based on Lard's breach of the Operating Agreement (the "Seokoh New York Action").[89]  Lard responded by filing its own complaint in the New York Supreme Court seeking specific performance against Seokoh and Kolmar (the "Lard New York Action" and, together with the Seokoh New York Action, the "New York Litigation").[90]  Both Members alleged the other had breached the Operating Agreement and that the Members could not agree on the

---

[85] *Id.*

[86] *Id.*

[87] Pet. ¶ 62.

[88] *Id.*

[89] Pet. ¶ 63.

[90] Pet. ¶ 64.

19

price, structure, or enforcement of any buyout transaction in accordance with the Deadlock provision.[91] And both Members filed counterclaims.[92]

On July 16, 2020, with the emergence of COVID-19 as a global health crisis, Seokoh proposed to Lard a Member resolution to dissolve PTP in accordance with the Operating Agreement at a special Board meeting proposed for July 27, 2020.[93] Lard declined, demanding Seokoh buy out Lard.[94]

On July 23, 2020, Seokoh filed with this Court its Verified Petition for Judicial Dissolution, seeking to dissolve PTP under 6 *Del. C.* § 18-802.[95] Lard sought a limited TRO in New York the same day to enjoin prosecution of this action, which the New York court granted on July 27, 2020.[96] Lard then sought summary judgment, arguing Seokoh must buy out Lard's interest in the Company for at least $7.75 million because Seokoh's filing of the Seokoh New York Action constituted an irrevocable acceptance of an option contract.[97]

---

[91] Pet. ¶ 65.

[92] Pet. ¶¶ 64–65; *see also* Lard's Opening Br. in Supp. of its Mot. to Dismiss ("Resp't's Opening Br.") Ex. D. at 1–4 (D.I. 34).

[93] Pet. ¶ 68.

[94] *Id.*

[95] D.I. 1.

[96] Pet. ¶¶ 64–65, 71–72, 74.

[97] Pet. ¶¶ 72–74; *see* Pet'r's Answering Br. Ex. B.

The New York court issued its written opinion on the motion for summary judgment on October 20, 2020 (the "New York Opinion").[98]  It rejected most of Lard's arguments, denied the motions for preliminary injunction and for summary judgment, and dissolved the TRO against Seokoh.[99]  Relevant here, the New York court held the following: (1) Lard breached the Operating Agreement by purporting to appoint a CEO without Board approval;[100] (2) during the Deadlock process, Lard again breached the Operating Agreement by interposing commercially unreasonable terms not required or anticipated by the Operating Agreement, causing the Deadlock process to fail;[101] (3) Lard breached the Operating Agreement for (at least) the third time when it refused to proceed with the reverse buyout transaction, in which Seokoh would buy out Lard's interest under Section 10.2(e) of the Operating Agreement;[102] and (4) Seokoh was not, as a matter of law, obligated to purchase Lard's interest by

---

[98] New York Op. at 1.

[99] *Id.* at 34–35.

[100] *Id.* at 18–19.

[101] *Id.*  The court concluded that Lard "fail[ed] to act commercially reasonably by, among other things, refusing to hold a Board meeting to consider dissolution" as "the value of [PTP] . . . decreased significantly," making "Lard's 49% interest . . . now worth substantially less than even the discounted price of $7 million." *Id.* at 18.

[102] *Id.* at 25–26.

virtue of its having commenced a lawsuit against Lard to enforce its rights under Section 10.2(e).[103]

## G. PTP's Status Quo

In the two years since the Deadlock process began, PTP has struggled to maintain senior management.[104]  It has been operating without a CEO since January 2019, a Chief Operating Officer since September 2018, and a Sales Director since October 2019.[105]  On October 9, 2020, PTP's East Coast Director of Sales and the last senior officer overseeing customer relations, Robin Fritz, left the company, citing in her resignation letter the "absence of a CEO" and "ownership dispute/lack of stability" as among the main reasons for her departure.[106]

PTP is being evicted from its current facilities without having identified an alternative facility to which it will relocate.[107]  It has no financing and no prospects of finding alternative financing.[108]  Its current assets barely exceed its current

---

[103] *Id.*

[104] *See* Pet. ¶ 78.

[105] Pet. ¶ 78(a).

[106] Pet. ¶ 75.  Fritz explained, "[t]he ownership dispute has been ongoing for almost two years and employees have no idea what the end goal is."  Pet'r's Answering Br. Ex. D (Fritz Email dated Oct. 9, 2020) (D.I. 40).

[107] Pet. ¶ 78(b).

[108] Pet. ¶ 78(c).

liabilities;[109] it has been operating at a loss since 2018;[110] and it is dependent on government subsidies to make payroll.[111] Further, it is facing a $65 million lawsuit brought by L'Oreal USA ("L'Oreal") against PTP and Wormser Corp., in which L'Oreal alleges breach of contract by Wormser Corp. for failure to provide an adequate product.[112]

### H. Procedural History

Seokoh initiated this action on July 23, 2020, petitioning for a court-ordered dissolution and appointment of a liquidating trustee of PTP.[113] It moved on the same date to expedite proceedings.[114] After the New York TRO was lifted, on November 20, 2020, Lard filed its motion to dismiss.[115] Oral argument was held on January 15, 2021, and the motion was submitted for decision that day.[116]

---

[109] *See* Pet'r's Answering Br. Ex. G (Balance Sheet and Profit & Loss Statement as of Sept. 30, 2020) (D.I. 40); Pet. ¶ 78(c).

[110] Pet. ¶ 78(d).

[111] *Id.*

[112] Pet. ¶ 55.

[113] D.I. 1; Pet. ¶ 69.

[114] D.I. 1.

[115] D.I. 34.

[116] D.I. 50 ("Oral Arg. Tr.").

## II. ANALYSIS

Lard's motion requires the Court to determine whether Seokoh's allegations, taken as true, support its petition for judicial dissolution. For reasons that follow, I am satisfied Seokoh has alleged a reasonably conceivable basis upon which judicial dissolution would be warranted.

### A. Standard of Review

"The pleading standards governing a motion to dismiss are minimal."[117] When considering a motion to dismiss under Chancery Rule 12(b)(6) for failure to state a claim upon which relief may be granted, the Court must:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[118]

### B. Judicial Dissolution of an LLC Under 6 *Del. C.* § 18–802

The Operating Agreement allows for the entry of a decree of judicial dissolution under Section 18-802, which provides that "[o]n application by or for a member or manager the Court of Chancery may decree dissolution of a limited

---

[117] *Matthew v. Laudamiel*, 2012 WL 605589, at *12 (Del. Ch. Feb. 21, 2012).

[118] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011); *see also* Ct. Ch. R. 12(b)(6).

liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."[119]  In this regard, a petitioner seeking judicial dissolution in Delaware on the ground that it is no longer reasonably practicable to carry on the LLC's business need not "show that the purpose of the [LLC] has been 'completely frustrated.'"[120]  Rather, "[t]he standard is whether it is reasonably practicable for [the LLC] to continue to operate its business in conformity with its [Operating Agreement]."[121]

"Our law provides no blueprint for determining whether it is 'not reasonably practicable' for an LLC to continue,"[122] but several factual circumstances indicative of a lack of "reasonable practicability" have "pervaded the case law: (1) the members' vote is deadlocked at the Board level; (2) the operating agreement gives no means of navigating around the deadlock; and (3) due to the financial condition of the company, there is effectively no business to operate."[123]  None of these factors

---

[119] 6 *Del. C.* § 18-802; OA § 10.1.

[120] *Fisk Ventures LLC v. Segal*, 2009 WL 73957, at *4 (Del. Ch. Jan. 13), *aff'd*, 984 A.2d 124 (Del. 2009).

[121] *Id.*

[122] *In re GR Burgr, LLC*, 2017 WL 3669511, at *5 (Del. Ch. Aug. 25, 2017).

[123] *Fisk Ventures*, 2009 WL 73957, at *4.

is "individually dispositive; nor must they all exist for a court to find it no longer reasonably practicable for a business to continue operating."[124]

While it is true, as Lard emphasizes, that judicial dissolution of an LLC is a "limited remedy that this court grants sparingly,"[125] dissolution may be warranted even where an LLC is "technically functioning" and "financially stable" if the petitioner can demonstrate that the entity is otherwise stuck within a "residual, inertial status quo" that prevents it from "operating or from furthering its stated business purpose."[126]  In the alternative entity context, dissolution is warranted where "the LLC's management has become so dysfunctional or its business purpose so thwarted that it is no longer practicable to operate the business, such as in the case of a voting deadlock or where the defined purpose of the entity has become impossible to fulfill."[127] Whether the deadlock is operational or purpose-driven, this court has emphasized that a judicial decree of dissolution is typically inappropriate

---

[124] *Id.*

[125] *In re Arrow Inv. Advisors, LLC*, 2009 WL 1101682, at *2 (Del. Ch. Apr. 23, 2009).

[126] *Fisk Ventures*, 2009 WL 73957, at *4 (citing *Haley v. Talcott*, 864 A.2d 86, 91, 96 (Del. Ch. 2004)).

[127] *Arrow Inv. Advisors*, 2009 WL 1101682, at *2; *see also* Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 10.07[c][2], at 81–87 (2019) (collecting cases).

when the entity's constitutive documents provide an equitable and effective means of overcoming the deadlock.[128]

Lard contends Seokoh has failed adequately to plead a basis for judicial dissolution under Delaware law because Seokoh has majority control of the Board. Accordingly, Lard argues the purported deadlock is a product of Seokoh's litigation-driven imagination. Moreover, says Lard, even if Seokoh has adequately pled deadlock, the Operating Agreement provides for a deadlock procedure that comprehensively resolves the dispute. By Lard's lights, Section 10.2(e) sets forth an option that was irreversibly exercised by both parties when they initiated their respective actions in New York. While the New York court has yet to determine who, as between the Members, is entitled to exercise that option, or what price should be paid in the exercise of the option, the option contract must, in all events, be specifically performed. Dissolution would, under Lard's "option theory," be unlawful.

Seokoh responds that the New York court has already rejected Lard's "option theory" on summary judgment, and Section 14.5(b) of the Operating Agreement

---

[128] *See Fisk Ventures*, 2009 WL 73957, at *4; *Vila v. BVWebTies LLC*, 2010 WL 3866098, at *7–8 (Del. Ch. Oct. 1, 2010); *Lola Cars Int'l Ltd. v. Krohn Racing, LLC*, 2010 WL 3314484, at *23–24 (Del. Ch. Aug. 2, 2010); *cf. In re Arthur Treacher's Fish & Chips of Ft. Lauderdale, Inc.*, 386 A.2d 1162, 1166 (Del. Ch. 1978) (holding that the General Assembly's use of the word "may" in 8 *Del. C.* § 273(b) clearly indicates that the remedy of judicial dissolution is discretionary).

makes clear that questions concerning the interpretation or enforcement of the Operating Agreement are to be decided exclusively in New York. Even if this Court elects to disregard the forum selection clause because it needs to construe the Operating Agreement as it adjudicates the petition to dissolve PTP, Seokoh maintains the Court should find persuasive the New York court's rejection of Lard's option contract theory.

Because Seokoh's invocation of the Operating Agreement's forum selection clause raises a threshold issue, I address that question first. I then turn to whether Seokoh has well pled a claim for judicial dissolution.

### C. The New York Forum Selection Clause and the New York Opinion

Both parties agree this Court has exclusive authority to dissolve PTP under Section 18-802.[129] Seokoh argues, however, that the Court lacks authority to adjudicate Lard's option theory because the Operating Agreement contains a clause designating New York as the exclusive forum in which "any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with" the Operating Agreement must be brought.[130] And the New York court has already spoken on the issue. Thus, while Seokoh acknowledges

---

[129] Pet'r's Answering Br. at 29 n.136 ("[T]his Court is vested with exclusive jurisdiction over the judicial dissolution of Delaware limited liability companies."); Resp't's Reply Br. at 1; *see also* 6 *Del. C.* § 18-802.

[130] OA § 14.5(b).

"this Court may consider the adequacy of the Deadlock procedure with regard to dissolution as a part of its jurisdiction over dissolution proceedings," it asserts I must not revisit the rulings in the New York Opinion because the parties agreed to "have claims regarding the interpretation of the LLC Agreement heard before a New York court."[131]

With all respect for my colleague in New York, I cannot agree with Seokoh that the New York Opinion is controlling in this statutory dissolution proceeding. "Although the Court generally will respect the parties' choice of forum, the parties cannot contract for jurisdiction where it otherwise is unavailable."[132] It is well-settled in New York that New York courts do not have subject matter jurisdiction to order dissolution of a foreign business entity; instead, that question is rightfully addressed to the courts of the state in which the entity was created.[133] The New York

---

[131] Pet'r's Answering Br. at 29–30.

[132] *Sun Life Assurance Co. of Can. v. Gp. One Thousand One, LLC*, 206 A.3d 261, 263 (Del. Super. 2019).

[133] *Raharney Cap., LLC v. Cap. Stack LLC*, 25 N.Y.S.3d 217, 217–18 (N.Y. App. Div. 2016) ("[C]onsistent with decisions from the Court of Appeals, this Court, and our sister departments of the Appellate Division, . . . the courts of this state *do not have subject matter jurisdiction to judicially dissolve a foreign business entity.* Instead, the decision as to whether dissolution is appropriate lies with the courts of the state in which the entity was created." (emphasis added)); *see also* Peter B. Ladig & Kyle Evans Gay, *Judicial Dissolution: Are the Courts of the State That Brought You In the Only Courts that Can Take You Out?*, 70 BUS. LAW. 1059, 1059, 1061 (2015) (arguing persuasively that "a court cannot judicially dissolve an entity formed under the laws of another jurisdiction because dissolution is different than other judicial remedies," noting that "[j]ust as a state regulates

29

court, therefore, lacks jurisdiction to issue a decree of judicial dissolution for PTP.[134]

Seokoh opted to bring this judicial dissolution action in Delaware. To decide whether dissolution is appropriate, it is appropriate for the Court first to consider whether a viable exit mechanism exists in the event of Board deadlock.[135] According to Lard, Section 10.2(e) functions as a viable exit mechanism for both Members and has, in fact, been invoked as an irrevocable option: either Seokoh irrevocably exercised its option to buy Lard's interests in PTP when it filed the Seokoh New York Action, or Lard exercised its option to sell its interests when it counterclaimed in the Lard New York Action.[136] Either way, Lard's theory of the case is that Seokoh has sealed its fate; it must buy out Lard and has no right, therefore, to seek to dissolve PTP. By raising this defense to dissolution as a matter of law, Lard has effectively placed at issue before this Court the Operating Agreement's Deadlock procedure.[137]

---

the birth of an entity under its own laws without the interference or participation of its sister states, so too should judicial dissolution be determined by the laws of the state of birth").

[134] To be clear, the New York court has never suggested it could or would entertain a request to dissolve PTP. It appropriately decided the issues before it in the context of the parties' competing requests for decrees of specific performance of the Operating Agreement.

[135] *Haley*, 864 A.2d at 96.

[136] *See* Resp't's Opening Br. at 1–2.

[137] The court's exclusive jurisdiction over dissolution distinguishes this case from Seokoh's cited authority, *Ashall Homes Ltd. v. ROK Entm't Gp., Inc.* 992 A.2d 1239 (Del. Ch. 2010). There, the court addressed whether a fraudulent inducement claim could be heard in any court of competent jurisdiction despite the parties' contractual choice of a particular forum.

While the New York court denied Lard's motion for summary judgment on the option theory, it did not enter a final decision on any live issues that are implicated by this Court's dissolution analysis.[138] Seokoh stipulates, as it must, that the New York Opinion is not binding under the doctrines of res judicata or collateral estoppel, which apply only after a final determination is made on the merits.[139] Further, the parties have agreed to stay the New York Litigation in favor of this dissolution action.[140] This Court, therefore, must decide certain issues addressed in the New York Opinion as a matter of course prior to rendering any binding decision on the Petition for Dissolution.[141]

---

*See id.* at 1246–48 (enforcing a contractual forum selection clause). In this case, for reasons explained, Seokoh's petition for dissolution must be adjudicated in the Court of Chancery.

[138] *See* New York Op. at 25–26, 34–35.

[139] *See* Pet'r's Answering Br. at 30–31; *135 Evergreen Corp. v. Delvalle*, 115 N.Y.S.3d 804, 2019 WL 2275480, at *2 (N.Y. App. Term 2019) ("[R]es judicata, or claim preclusion, requires a final adjudication on the merits."); *McGrath v. Gold*, 36 N.Y.2d 406, 412 (N.Y. 1975) ("To invoke collateral estoppel, the issue of ultimate fact must have been determined by a 'final judgment.'"); *see also In re Tr. FBO duPont Under Tr. Agreement Dated Aug. 4, 1936*, 2018 WL 4610766, at *9 (Del. Ch. Sept. 25, 2018) ("[W]hen applying the preclusion analysis to a judgment from another state, the foreign judgment should be given the same effect that it has in the state of rendition with respect to the persons, the subject matter of the action and the issues involved." (internal quotations omitted)).

[140] D.I. 52.

[141] As discussed below, while not binding, I do find the New York Opinion persuasive.

**D. Seokoh Has Adequately Pled That PTP's Board Is Deadlocked**

Under the Operating Agreement, PTP's Board has the exclusive power to manage the business and affairs of the Company.[142] The Board is unable to act on Reserved Matters unless the Members unanimously agree.[143] Reserved Matters include the acquisition of PTP's facilities, the financing of the Company's operations and its dissolution.

While Lard points out that Seokoh has a tie-breaking vote on the Board for garden variety matters, it wrongly claims this confers upon Seokoh "the [unexercised] authority to break the claimed deadlock."[144] As pled, for more than two years, Seokoh and Lard have been unable to resolve their deadlock on issues requiring their unanimous agreement—including, *inter alia*, the location of PTP's physical facilities, the Company's financing, the appointment of a CEO and now, the dissolution of the Company.[145] "[T]his court has rejected the notion that one co-equal fiduciary may ignore the entity's governing agreement and declare himself the sole 'decider.'"[146] Neither Seokoh's 51% ownership interest nor its tie-

---

[142] *See* OA §§ 7.1, 7.2.

[143] *Id.* § 8.6.

[144] Resp't's Opening Br. at 13–15.

[145] Pet. ¶¶ 24–27, 30–43, 58–59, 64–65, 78; New York Op. at 18–19.

[146] *See Vila*, 2010 WL 3866098, at *1, 6–8 (ordering judicial dissolution after finding that the manager of an LLC bound to cooperate with a co-equal manager had "unilaterally

breaking vote at the Board level offer a means to avoid the alleged source of the parties' deadlock.

Lard also asserts that Seokoh's claims concerning Reserved Matters fail because Seokoh has not alleged an instance where it sought approval, through Board resolution, to move forward on any of those issues.[147] Not surprisingly, Lard cites no authority for the proposition that a petitioner must allege it sought to break a deadlock through formal board resolutions in order to well plead that a board is in deadlock. The Petition alleges that Seokoh and Lard discussed facilities and financing on numerous occasions but could not agree on a path forward.[148] Delaware law does not require a member to plead she made performative proposals she knew would be dead-on-arrival as a predicate to seeking judicial dissolution. Such a

---

arrogated to himself decision making authority over" the company, and concluding "it is not reasonably practicable for the LLC to operate consistently with its operating agreement"); *see also Acela Invs. LLC v. DiFalco*, 2019 WL 2158063, at *33 (Del. Ch. May 17, 2019) (citing *Vila* and holding, "[t]he same conclusion is compelled here").

[147] Resp't's Opening Br. at 16.

[148] Pet. ¶¶ 46–48, 68, 79–80. For example, the CEOs and representatives of Kolmar and Lard met on February 27, 2019 to resolve Reserved Matters but could not come to an agreement. Pet. ¶¶ 46–48.

requirement would put form over substance, contrary to our law's well-established equitable principles.[149]  Seokoh has well pled deadlock.[150]

Seokoh also has pled a reasonably conceivable basis to infer that PTP's financial condition leaves effectively no business for the Board to manage and operate.  By Lard's account, PTP remains a viable business with significant streams of revenue from multiple corporate clients.[151]  While Lard admits PTP is struggling, it cites to then-Vice Chancellor Strine's decision *In re Arrow Investment Advisors, LLC*[152] to argue that the Company is a far cry from the "confluence of situationally specific adverse financial, market, product, managerial, or corporate governance circumstances [that] make it nihilistic for the entity to continue."[153]

Lard's citation to *Arrow Investments* misses the mark.  In that case, the court addressed a purpose-driven dissolution petition filed after the LLC began pursuing strategies that were not part of the original business plan but within the scope of the LLC agreement's purpose clause.  Here, by contrast, Seokoh claims PTP's Board-

---

[149] *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983) ("[E]quity regards substance rather than form."); *accord Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007) ("It is the very nature of equity to look beyond form to the substance of an arrangement.").

[150] With this said, Seokoh may ultimately fail to *prove* deadlock for precisely the reasons identified by Lard in its motion to dismiss.

[151] Resp't's Opening Br. at 31–34.

[152] 2009 WL 1101682 (Del. Ch. Apr. 23, 2009).

[153] *Arrow*, 2009 WL 1101682 at *3.

level deadlock has ground Company operations to a halt. That distinct scenario was confronted by the court (again by then-Vice Chancellor Strine) in *Haley v. Talcott*,[154] where the court dissolved an LLC even though it continued to generate meagre profits.[155] The court reasoned that, while the business was "technically functioning . . . [its] operation [wa]s purely a residual, inertial status quo," and it was "not credible that the LLC could, if necessary, take any important action that required a vote of the members."[156]

While the LLC in *Haley* differs from PTP in its requirement that the members agree on any company act, and its "status quo" exclusively benefitted one of the 50% members, Seokoh alleges the Company cannot act on critical issues and has *negative* earnings. Specifically, Seokoh alleges:

- PTP has in the past relied on loans from Members to stay solvent, even in times with positive economic tailwinds.[157]

- PTP must currently rely on government subsidies to meet its payroll obligations.[158]

---

[154] 864 A.2d 86 (Del. Ch. 2004).

[155] *Id.* at 91.

[156] *Id.* at 96.

[157] *See* Pet. ¶ 29.

[158] Pet. ¶ 78(d).

- PTP's losses are mounting, as it recorded a $1.2 million net loss for Q1 2020 and is projected to incur a $2.5 million net loss in Q2 2020.[159]

- PTP is confronting customer retention issues.[160]

- A major customer of PTP brought suit against PTP and Wormser Corp. claiming up to $65 million in damages.[161]

- PTP has defaulted on its $20.5 million lines of credit and is unable to obtain any alternative financing.[162]

- The Members disagree on business philosophy, facility expansion, the root cause of and solution to the Company's poor performance in 2018 and 2019, the appointment of a CEO or other management positions and PTP's lease, among other issues fundamental to the Company's survival.[163]

While Lard argues that Seokoh has not pled PTP is without revenue, *profits* are the

lifeblood of a company and Seokoh has well pled that PTP's earnings are negative

as it struggles to make payroll.[164]

---

[159] Pet. ¶ 67.

[160] Pet'r's Answering Br. Ex. H at 19.

[161] Pet. ¶ 55.

[162] Pet. ¶ 78(c). Lard argues that because Kolmar is the source of PTP's loan obligations, PTP's financial hardship is somehow Kolmar's doing. *See* Oral Arg. Tr. at 42:19–43:2. That contention cannot support dismissal, particularly at the pleading stage. Kolmar is entitled to recover on loans it guaranteed for the parties' joint venture; its past efforts to help the Company succeed cannot now be thrown in its face in a dissolution proceeding when those efforts failed.

[163] Pet. ¶ 78(e).

[164] Pet. ¶ 78(d).

Gripped in deadlock, hemorrhaging cash, defaulting on loans and unable to appoint key management personnel, no wonder both Seokoh and Lard seek to exit the Company one way or another. The evidence may ultimately support Lard's view of PTP's financial fitness. But, for now, Seokoh has well pled that PTP's languishing financial condition favors dissolution.

While the Company's deadlock and deteriorating financial condition support Seokoh's petition for dissolution, PTP is an LLC with an "I cut; you choose" exit provision in its constitutive document.[165] "The Delaware LLC Act is grounded on principles of freedom of contract. For that reason, the presence of a reasonable exit mechanism bears on the propriety of ordering dissolution under 6 *Del. C.* § 18-802."[166] With this in mind, I turn to the efficacy of the Operating Agreement's Deadlock procedure.

## E. It Is Reasonably Conceivable the Deadlock Procedure Has Been Rendered Ineffective

Where an LLC's operating agreement "provides a fair opportunity for the dissenting member who disfavors the inertial status quo to exit and receive the fair market value of her interest," then "it is at least arguable that the limited liability company may still proceed to operate practicably under its contractual charter

---

[165] *See Haley*, 864 A.2d at 96.

[166] *Id.*

because the charter itself provides an equitable way to break the impasse."[167] To obtain dismissal of a petition for judicial dissolution based on a contractual exit plan, however, the movant must demonstrate, as a matter of law, that the exit mechanism "can actually extract [the parties] fairly."[168]

Lard argues the Deadlock procedure in the Operating Agreement unambiguously and comprehensively provides a means to extract the Members from any Deadlock that may exist. According to Lard, the Deadlock procedure within Section 10.2(e) contemplates the creation of a binding option contract, identical to the buyout provision held to be an irrevocable option contract in *Walsh v. White House Post Productions, LLC*.[169] Seokoh triggered this option when it sought an order of specific performance to purchase Lard's interest in the Seokoh New York Action. According to Lard, Seokoh breached the Operating Agreement, triggering the 30% enhancement in Section 10.2(e) and must now buy out Lard's interest at a purchase price of over $13,000,000.

Lard admits, as it must, that it is relitigating a claim already rejected by the New York court. In the New York Opinion, the court held that Lard breached its

---

[167] *Id.*

[168] *Id.*

[169] 2020 WL 1492543 (Del. Ch. Mar. 25, 2020).

obligations under the Operating Agreement and Kolmar was, therefore, entitled to revoke its offer to buy out Lard's interest. The New York court explained:

> Kolmar's subsequent unilateral offers to resolve this matter including bringing the Kolmar Lawsuit were not accepted prior to Kolmar rescinding its prior offers to resolve this matter. Kolmar had a right to rescind the March Deadlock Notice because the terms contained in the Deadlock Notice were commercially reasonable (i.e., no one would expect to have to continue to guaranty loans in a business that they are exiting) and they continued to act in a commercially reasonable manner including by attempting to call a meeting to seek dissolution of [PTP] effectively rescinding its March Deadlock Notice which Lard refused. Finally, no reading of the Operating Agreement supports the notion that the Deadlock Provision is designed to have the acquiring member satisfy [PTP's] obligation to repay the member loans. Accordingly, summary judgment is denied.[170]

The parties stipulate that the New York Opinion did not squarely adjudicate Lard's option theory, however, because it held Lard materially breached the contract after Kolmar offered to buyout Lard under the bargained-for Deadlock procedure.[171]

Contrary to Lard's contentions, the New York court's reasoning is consistent with Delaware law. Even assuming *arguendo* that Section 10.2(e) contemplated an option contract, *Walsh* itself makes clear that the exercise of an option creates an "enforceable bilateral contract."[172] While Seokoh could not unilaterally revoke a

---

[170] New York Op. at 26.

[171] *Id.* at 25–26.

[172] *Walsh*, 2020 WL 1492543, at *6.

39

binding bilateral contract in the ordinary course, "[a] party is excused from performance under a contract if the other party is in material breach thereof."[173]

The New York Opinion rejected Lard's option theory on the ground that Lard breached Section 10.2(e) by insisting on commercially unreasonable terms and failing to perform its obligations under the Deadlock provisions. This is a reasonable construction of the Operating Agreement. By Lard's own admission, the Deadlock procedure's text (or lack thereof) left material terms undefined, requiring that "the parties would negotiate the open material terms (such as the closing date, the extension on the lease, the supervision of the business until closing, etc.)." [174] But, according to the Petition (and the New York Opinion), Lard, among other key points, refused to comply with Kolmar's request for Lard to replace it as the guarantor of PTP's lines of credit upon buying out Kolmar's Member interests.[175] This arguably was commercially unreasonable, as Kolmar would no longer have any part of the business, and yet Lard insisted it remain personally liable for the Company's credit.

---

[173] *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003).

[174] Resp't's Opening Br. Ex. D ¶¶ 34–35, 37 ("Seokoh's Deadlock Notice failed to include material terms necessary to consummate the sale of Seokoh's interest to Lard. By necessity, of course, Lard's buyout of Seokoh's interest in Process Tech was a . . . complex transaction that would require further documentation – beyond simply the purchase price – to transition the business from Seokoh to Lard, which would take time.").

[175] Pet. ¶¶ 51–52.

In these circumstances, it is reasonable to infer that Seokoh acted in accord with its contractual rights when, in the June Letter, Kolmar's CEO, Sang Hyun Yoon, claimed that Lard had breached the Operating Agreement.[176] The June Letter stated on behalf of Kolmar: "we hereby exercise our option to buy Lard-PT's 49% ownership in the Company [PTP] at US $10,000,000 in accordance with Section 10.2(e) of the LLC Agreement."[177] While Kolmar pointed out it "has the right to buy Lard-PT's Interest at a 30% discount under Section 10.2(e)," it was "willing to pay the full price . . . out of good faith and in the interest of swift transition of ownership," but only "on the express condition that the deal be closed by July 31, 2019."[178] Lard took no action. If Section 10.2(e) was an option turned binding

---

[176] Lard confuses what *Walsh* refers to as "irrevocable" when the court discusses an "irrevocable option." *See* Resp't's Reply Br. at 19 (arguing "authority concerning the excuse of performance in the face of supposed material breach is beside the point" because "the exercise of an option is irrevocable"). The "irrevocable" nature of an option describes its relationship to the offeror, not the offeree. 1 WILLISTON ON CONTRACTS § 5:16 (4th ed. 1993) ("During the option period the irrevocable offer may only be modified, released or rescinded by agreement of the parties. It cannot be unilaterally withdrawn."). Under Lard's option theory, then, the breaching Member could not revoke its "offer" to the non-breaching Member for a reasonable period of time—hence the option's "irrevocability." Once the non-breaching Member exercises the option, however, a bilateral contract is formed. *Id.* Performance of that otherwise binding contract may be excused in the event of a material breach, such as nonperformance. *See DeMarie v. Neff*, 2005 WL 89403, at *4 (Del. Ch. Jan. 12, 2005). As noted, Section 10.2(e) left open material terms necessarily to be negotiated by the parties. In the event a party fails to negotiate in good faith or otherwise fails to perform its end of the bargain, then its counterparty is within rights to rescind its offer. *Id.*

[177] New York Op. at 14–16.

[178] *Id.*

bilateral contract upon its exercise, then Lard conceivably was in breach of Section 10.2(e) by virtue of its nonperformance.[179]

Thus, months after its June Letter and its July deadline, with its counterparty allegedly in breach and its own hands clean,[180] Kolmar conceivably could have sued

---

[179] *See BioLife*, 838 A.2d at 278; *see also* 17A AM. JUR. 2D *Contracts* § 594 (2004) ("[I]f it is clear that the parties intend that time is of the essence to a contract, timely performance is essential to a party's right to require performance by the other party. . . . It is a general rule that one who contracts to complete work within a certain time is liable for the damage for not completing it within that time, unless the delay is excused or waived." (citations omitted)); 14 WILLISTON ON CONTRACTS § 43:7 (4th ed. 1993) ("[E]ven in the absence of a clause making time of the essence, time will generally be regarded as of the essence in option contracts and in contracts for the sale of property which is subject to rapid fluctuations in value.").

[180] Lard argues that Kolmar first breached the Operating Agreement by purchasing the land where PTP maintains its offices, and "[a]s a general rule the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform." *Hudson v. D & V Mason Contrs., Inc.*, 252 A.2d 166, 170 (Del. Super. 1969). As a result, Lard argues its alleged material breach must be excused once the infractions are reduced. But even if Kolmar's purchase of PTP's land breached the Operating Agreement, that breach would have occurred nearly two years prior to Kolmar's exercise of its option. *See* Pet. ¶ 26. Lard's alleged course of conduct after Seokoh's real estate purchase— acquiescence to its acquisition and PTP's continual compliance with the lease's (unchanged) terms—make it reasonably conceivable Lard waived any claim related thereto. *See* 17A AM. JUR. 2D *Contracts* § 681 (2004) ("[A]nything that induces the other party to perform an agreement after a default, or which shows that the agreement subsists after a default, amounts to a waiver. . . . The waiver of a breach of contract may be shown by an act that is so inconsistent with an intent to enforce the right that arises upon the breach as reasonably to induce a belief that the right has been relinquished." (citations omitted)); *accord* 23 WILLISTON ON CONTRACTS § 63:9 (4th ed. 1993) ("A party to a contract may . . . waive a breach of a contractual provision without consideration or estoppel, if the waiving party did not commit the breach, the breach does not involve a total repudiation of the contract so that the innocent party continues to receive some of the bargained-for consideration, and the innocent party is aware of the breach and intentionally waives the right not to perform by continuing to perform or to accept the partial performance of the breaching party. . . . The issue whether a [waiver] has occurred is typically one of fact for the jury." (citations omitted)).

Lard or rescinded the contract consistent with Delaware law.[181] While Kolmar explored an accord and satisfaction with Lard as an alternative to litigation,[182] Seokoh well pleads that nothing came of these efforts because Lard was either unwilling or unable to enter into a separate agreement.[183] Seokoh then filed a lawsuit in New York seeking a remedy for Lard's breach. Seokoh's prayer for specific performance of Section 10.2(e) represented to the New York court not only that an underlying, legally cognizable agreement existed, but also that Lard breached the agreement by failing to perform.[184] Lard continued to resist performance throughout that litigation; and its alleged nonperformance of a binding contract conceivably puts it in continued breach of Section 10.2(e).

It is also reasonably conceivable that the breach is material, as Lard's repudiation allegedly extended PTP's paralyzed status quo and, in doing so, exacerbated its continued financial decline.[185] Indeed, Seokoh seeks dissolution in part because Lard's interest is no longer worth the $7.75 million, at minimum,

---

[181] Pet. ¶ 61; *see DeMarie*, 2005 WL 89403, at *4; *BioLife*, 838 A.2d at 278.

[182] *See Bhaskar S. Palekar, M.D., P.A. v. Batra*, 2010 WL 2501517, at *9 (Del. Super. May 18, 2010); 29 WILLISTON ON CONTRACTS § 73:27 (4th ed. 1993).

[183] *See* Pet. ¶ 61.

[184] *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003).

[185] *See* Pet. ¶¶ 75, 78.

it demanded when it initiated the Seokoh New York Action.[186]   These factual

circumstances conceivably justify Seokoh's subsequent refusal to perform, as a

"party may terminate or rescind a contract because of substantial nonperformance or

breach by the other party."[187]

The parties' alleged inability to break their Deadlock makes plain the

Deadlock procedure's shortcomings.   The procedure does not mandate a price,

pricing formula or a closing timeline at which either Member can buy out the other;

negotiations regarding these terms are required as a matter of course.   The parties to

the Operating Agreement clearly presumed that the Members would deal with each

---

[186] Pet. ¶¶ 78–79.

[187] *DeMarie*, 2005 WL 89403, at *4 (internal quotations and citations omitted).  While Lard contends that Seokoh continues to pursue a breach of contract action in New York for $10 million in damages, and so never rescinded the March Deadlock Notice, this is not improper as Seokoh may elect its remedy.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 378 (1981) (explaining that, where a party with a cause of action for breach of contract "has more than one remedy," that party's "manifestation of a choice of one [remedy] by bringing suit or otherwise is not a bar to another remedy unless the remedies are inconsistent and the other party materially changes his position in reliance on the manifestation").  Seokoh's position in its New York action is that Section 10.2(e) is a discretionary remedy for Lard's failure to buy out Seokoh's interest, akin to an acceleration clause.  Pet'r's Answering Br. at 47–48.  Under its construction, Seokoh is entitled to seek a declaratory judgment and compensatory damages for Lard's breach, measured as the price Lard failed to pay after agreeing to purchase Seokoh's interest in PTP.  *See Maravilla-Diego v. MBM Constr. II, LLC*, 2015 WL 4468625, at *5 (Del. Super. July 21, 2015).  The claim is also consistent with Section 14.3 of the Operating Agreement, which provides that, "[a]ll rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available, whether by contract, at Law, in equity or otherwise."  OA § 14.3.  In any event, the parties have elected to stay their litigation activities in New York while this Court determines whether judicial dissolution is justified.

other in a commercially reasonable manner and consummate the "divide and choose" transaction in good faith. Based on the well-pled facts in the Petition, that appears to have been wishful thinking. With PTP's value in precipitous decline, litigation between the parties breaking out in courts across the country and no end to the deadlock in sight, I find it reasonably conceivable that judicial dissolution is warranted.

### III. CONCLUSION

For the foregoing reasons, Respondent's motion to dismiss is DENIED.

**IT IS SO ORDERED.**